**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RENEE C. ELVIRA and EDWIN RUIZ; | ) | CIVIL ACTION |
| Plaintiffs; | ) | |
| | ) | File No.  1:15-cv-7291 |
| v. | ) | |
| OCWEN LOAN SERVICING, LLC; | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Renee C. Elvira and Edwin Ruiz, by the undersigned attorneys, file this complaint against Defendant Ocwen Loan Servicing, LLC:

### NATURE OF THE ACTION

1.  Plaintiffs Renee C. Elvira and Edwin Ruiz bring this action for damages for breach of contract, and for violations of the Illinois Consumer Fraud Act and Deceptive Business Practices Act ("ICFA") and the Fair Debt Collection Practices Act ("FDCPA").

2.  All of the claims stated herein stem from the wrongful servicing and debt collection activities related to Plaintiffs' home mortgage loan.

### JURISDICTION AND VENUE

3.  Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 1692k (FDCPA), as the action arises under the laws of the United States. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391 as the subject property is in this District and the events occurred in this District.

4.  Diversity jurisdiction is conferred upon this Court by 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000.00 and is between citizens of different states.

**PARTIES**

5.   Plaintiffs RENEE C. ELVIRA and EDWIN RUIZ (collectively "Ruiz") are natural persons that own and occupy the property located at 10853 Ursula Drive, Willow Springs, IL 60480 ("subject property") as their primary residence.

6.   Defendant OCWEN LOAN SERVICING, LLC ("Ocwen") is a Florida corporation with its principal place of business in Florida. Ocwen is a foreign company that acts as a debt collector and servicer of mortgage loans across the country, including in the state of Illinois.

**FACTUAL BACKGROUND**

**A.  Original Mortgage Loan and Dealings With JPMorgan Chase Bank, N.A.**

7.   On November 24, 2004, Ruiz obtained a mortgage loan in the amount $329,600.00 from Argent Mortgage Company, LLC for the purchase of the subject property as their family home. Ruiz raised her three children at the subject property.

8.   The loan included an interest rate of 7.125% and a monthly payment for principal and interest in the amount of $2,220.58. The loan also required monthly escrow payments for real estate taxes and insurance in the approximate amount of $600.00.[1]

9.   Sometime prior to 2008, servicing rights on the subject loan were sold to JPMorgan Chase Bank, N.A. ("Chase").

10. In 2011, Ruiz defaulted on her monthly payment obligations to Chase.

11. Toward the end of 2011, Ruiz submitted a loan modification application to Chase. Chase approved Ruiz for a trial loan modification that required three trial payments – due January 1, 2012, February 1, 2012, and March 1, 2012. If the three trial payments were made, the trial modification would be converted to a permanent loan modification.

---

[1] These amounts did change over the life of the loan as the interest rate was adjustable and the amount due for taxes and insurance did vary from year to year.

2

12. Ruiz made all three trial modification payments in full and on time and the loan was permanently modified and brought current.

13. On March 12, 2012, twelve days after Ruiz made her third trial payment, Chase sent Ruiz a notice informing her that servicing rights on her mortgage account were sold to Defendant Ocwen with an effective date of April 1, 2012.

**B. Ocwen's Conduct After the Transfer**

14. In April 2012, immediately after becoming the servicer, Ocwen did not acknowledge the previous loan modification implemented by Chase. Instead, Ocwen treated the loan as if it were in default. Ocwen sent Ruiz multiple letters informing Ruiz that she was in default and owed approximately $21,000.00 to bring the loan current.

15. In response to these letters, Ruiz called to advise Ocwen of the previous loan modification with Chase. Ruiz requested an April 2012 statement that included the proper monthly payment amount. Ocwen said that it had no record of the modification and "did not know" the proper payment amount. Ocwen stated it would investigate and call Ruiz back.

16. Over the next four months, Ocwen sent Ruiz multiple statements that Ruiz was in default and owed approximately $23,000.00 to $26,000.00 to bring the loan current.

17. Over this time period, Ruiz called Ocwen at least 15 times. Ocwen never provided any solution other than to promise an investigation. This investigation never occurred.

18. In August 2012, Ocwen advised Ruiz to apply for a new loan modification under the Federal Making Home Affordable Program ("HAMP").[2] Ocwen stated that a new loan modification would include better terms than Ruiz's previous loan modification with Chase.

19. Beginning in August 2012 and continuing through January 2014, Ruiz submitted at least

---

[2] The HAMP program requirements are set out in the HAMP Guidelines, corresponding Handbook, and Supplemental Directives. *See* Making Home Affordable Handbook v4.0, *available at* https://www.hmpadmin.com/portal/programs/guidance.jsp (last visited August 5, 2015) (click Archives).

five HAMP loan modification applications to Ocwen. This was a lengthy eighteen-month process of loan modification submittals, re-submittals, phone calls, and follow-ups with Ocwen.

20. After Ruiz would submit an application, Ocwen would inform Ruiz that some of the required documentation was "missing," even though Ruiz had already submitted the documents to Ocwen on multiple occasions. Ocwen would direct Ruiz to resend the "missing" documents.

21. After Ruiz resent the "missing" documents, Ocwen would again claim that the documents were either "never received" or "missing." Ocwen would again advise Ruiz to resend the "missing" documents or to start the process over from the beginning with a new application.

22. Over this period of time, Ruiz applied and re-applied under the HAMP program at least five times, sent Ocwen the identical paperwork at least fifteen times, and was assigned at least six different "relationship managers."

23. During the entire time that Ocwen was "reviewing" Ruiz for a HAMP loan modification, Ocwen sent Ruiz collection letters and threats of foreclosure.

24. The 18 months of applications, submittals, resubmittals, and threats of foreclosure were particularly stressful to Ruiz. As part of her many HAMP applications, Ruiz informed Ocwen of her medical conditions – including her stress and anxiety and the adverse effects on her physical health – in her hardship letters and phone calls.

### C.  The Operative Loan Modification

25. By February 2014, Ocwen was well aware that Ruiz was both physically and financially vulnerable and under an extreme amount of stress. Ruiz submitted her financial information and multiple hardship letters that documented her medical conditions. Ruiz orally advised Ocwen of her medical conditions many times between August 2012 and June 2014.

26. On February 25, 2014, Ocwen advised Ruiz if she reapplied for a modification "one more

4

time," it would provide Ruiz a loan modification with a $50,000.00 principal reduction. Ocwen advised Ruiz that it would follow up with her regarding a new loan modification application. Feeling defeated and having no choice but to submit, Ruiz agreed.

27. On May 17, 2014, Ruiz completed, signed, and sent a full loan modification package to Ocwen at Ocwen's direction.

28. On June 13, 2014, Ocwen sent Ruiz a modification agreement that stated:

> In order to accept this modification on your loan, you must complete ALL of the following steps **on or before** 7/1/2014 ("Due Date"):
>
> **1. SIGN** the bottom of the Agreement on the line(s) for the Borrower(s):
>
> **2. FAX** the fully executed Agreement to:   Attention:   Home Retention Department (407) 737-5693
>
> **3. PAY** the full down payment in the amount of:  $1,754.37
>
> **4. NEW MONTHLY PAYMENT:**
>
> | | |
> |---|---|
> | Principal and Interest Payment: | $993.58 |
> | Escrow Payment | $760.79 |
> | Total | $1,754.37 |
> | | **Stating on** 8/1/2014. |
>
> **5. SEND** proof of insurance coverage to:*     Attention: Escrow Department
> Fax: (888) 882-1816
> E-mail: updateinsuranceinfo@ocwen.com

*See* Exhibit A attached hereto is a true copy of the June 13, 2014 loan modification.

29. Additionally, the loan modification (hereinafter the "Operative Loan Modification") stated, "If ALL of the items above are not completed by the Due Date [7/1/14], the Agreement shall have no force or effect and any down payment received will be returned to you." *Id.* at p. 1.

30. The Operative Loan Modification provided a new principal balance of $298,454.32, an interest rate of 2.0%, and a monthly payment amount of $1,754.37. *Id.*

31. Also included with the Operative Loan Modification was a Balloon Disclosure that stated in relevant part, "Your estimated balloon payment amount is $149,221.20 and will be due in a single payment on __**[blank space]**__ provided that all payments are made in accordance with the loan terms...." *Id.* at p. 5 (emphasis added).

32. Believing the Operative Loan Modification was the best thing for her family, financial future, and her mental and emotional health, on June 30, 2014, Ruiz signed and returned the Operative Loan Modification to Ocwen on time and as directed. *Id.*

33. Also on June 30, 2014, Ruiz made her July 1, 2014 trial payment in the amount of $1,754.37 via Western Union.

34. Ocwen received and accepted Ruiz's executed Operative Loan Modification and trial down payment. Ruiz complied with all required terms prior to the July 1, 2014 due date. Ruiz's loan was modified and the Operative Loan Modification superseded the then existing mortgage contract.

35. On or around July 2, 2014, Ruiz contacted Ocwen to confirm receipt of the signed Operative Loan Modification and trial down payment. During the call, Ocwen confirmed that the signed agreement was received and accepted, the trial payment was received and accepted, and the Operative Loan Modification was finalized.

36. This finally provided Ruiz some relief. However, the relief was short lived.

37. On July 25, 2014, Ruiz received a call from her then relationship manager at Ocwen, Jigar Mawani ("Mawani"). Mawani informed Ruiz that the Operative Loan Modification could not be accepted because *Ocwen* made a "document printing error from its underwriting department." Mawani explained that *Ocwen* failed to include a maturity date on the Balloon Disclosure and Mawani threatened to "void" the Operative Loan Modification.

38. Ruiz informed Ocwen that the agreement was already finalized and that Ocwen's own error is not grounds to "void" the agreement.

39. Mawani advised Ruiz that since Ocwen made the error, Ocwen would prepare a new loan modification agreement that mirrored the Operative Loan Modification – this time with the

maturity date included on the Balloon Disclosure – and "back-date" the agreement.

40. Mawani misled Ruiz by stating that Ruiz "needed to sign the new agreement, and if she did not, the [Operative Loan Modification] would be voided." Mawani stated that Ocwen would send a representative from Florida (Ocwen's headquarters) to Ruiz's home so the "new" agreement could be immediately signed by both parties with the maturity date included on the Balloon Disclosure.

41. Mawani directed Ruiz to stop making payments on the Operative Loan Modification because it was "void." Ruiz's payment would resume once Ocwen provided Ruiz the "new" agreement that mirrored the Operative Loan Modification.

42. Although uncomfortable with "back-dating" documents or having a representative from Florida come to her home, Ruiz awaited the "new" agreement in an attempt to resolve all issues. Ocwen never sent the "new" agreement.

43. On July 28, 2014, Ocwen sent Ruiz a letter falsely stating, "At this time, your loss mitigation application is incomplete. Please provide a copy of the following missing or additional documents: A complete and executed copy of the attached Request for Mortgage Assistance (RMA), including all the required documentation."

44. First, Ruiz had submitted this documentation at least five times. Second, the Operative Loan Modification was already implemented, which required a completed RMA prior to its implementation. Third, this letter entirely contradicted Ruiz's conversation with Mawani.

45. On August 7, 2014, Ocwen advised Ruiz that she had a new relationship manager.

46. On August 22, 2014, Ruiz received a monthly mortgage statement from Ocwen dated August 18, 2014 setting forth an interest rate of "2.0%" a monthly modification payment of "$1,754.37."

47. These terms confirmed, or at least suggested, that the Operative Loan Modification was in fact finalized.

48. The following day, on August 23, 2014, Ruiz received a "Delinquency Notice" from Ocwen dated August 19, 2014 that stated, "As of 08/19/14, you are 595 days delinquent on your mortgage loan...Failure to bring your loan current may result in fees and foreclosure – the loss of your home." The letter also stated, "Total: $39,821.95. You must pay this amount to bring your loan current."

49. This letter suggested that Ocwen had not acknowledged the Operative Loan Modification. However, the August 19, 2014 letter also stated, "Our records indicate that you have agreed to participate in the Modification Approved."

50. On September 18, 2014, confused by the conflicting information in Ocwen's correspondences and the discussion that Ruiz had with Mawani on July 25, 2014, Ruiz sent a letter to Ocwen disputing the handling of her account, the conflicting letters, and the previous conversation with Mawani. This letter was faxed to her new relationship manager, Mr. Bharat.

51. Ocwen did not respond to Ruiz's letter.

52. On September 17, 2014, Ocwen sent Ruiz a statement claiming that Ruiz had an "amount due" of "$395,725.88," and included a payment coupon in the amount of "$395,725.88."

53. On September 29, 2014, Ocwen sent Ruiz a letter that the Operative Loan Modification was denied because Ruiz did not sign the loan modification contract. In reality, Ruiz signed and properly returned the loan modification exactly as she was directed.

54. Also on September 29, 2014, Ocwen sent Ruiz a different letter that stated the Operative Loan Modification was denied because Ruiz "did not make all of the required Trial Period Plan payments by the end of the trial period." In reality, the Operative Loan Modification only

included one trial down payment, which Ocwen accepted prior to the July 1, 2014 due date.

55. Additionally, Mawani specifically directed Ruiz to stop making payments on July 25, 2014, and threatened to "void" the contract based upon Ocwen's underwriting error as addressed in paragraphs 37 through 41 above.

56. On October 20, 2014, Ocwen sent Ruiz another "Delinquency Notice" that stated, "As of 10/19/14, you are 657 days delinquent on your mortgage loan...Failure to bring your loan current may result in fees and foreclosure – the loss of your home." The letter also stated, "Total: $44,121.88. You must pay this amount to bring your loan current."

57. On October 21, 2014, Ocwen sent Ruiz another loan modification application.

58. On October 23, 2014, feeling defeated, confused, and having no choice but to submit, Ruiz sent the completed application to Ocwen via UPS ground delivery.

59. On October 30, 2014, Ocwen sent Ruiz a letter that, again, claimed that she did not submit the required documents.

60. The October 30, 2014 letter also falsely stated, "According to our Records, your current Foreclosure Sale Date is scheduled for 7/20/15." In reality, there was no foreclosure case even filed at that time, nor a foreclosure sale scheduled.

61. On November 3, 2014, Ocwen again sent Ruiz a letter that stated, "According to our Records, your current Foreclosure Sale Date is scheduled for 7/20/15." In reality, there was no foreclosure case even filed at that time, nor a foreclosure sale scheduled.

62. Ruiz, believing the foreclosure sale was actually scheduled and that she had lost her home, was horrified. Ruiz began suffering more serious bouts of stress, anxiety, and depression, that required medical treatment and medication.

63. On December 3, 2014, without any explanation to Ruiz, Ocwen, through Wells Fargo Bank, N.A., as trustee, filed a mortgage foreclosure lawsuit against Ruiz in state court.

64. The foreclosure case is captioned: *Wells Fargo Bank, N.A. as Trustee for Park Place Securities, Inc. Asset-Backed Pass-Through Certificates Series 2005-WCH1 v. Ruiz, et al.*, Case No. 14 CH 19316 (Cook County).

65. The foreclosure complaint alleged at ¶3(J) that Ruiz was in default for monthly payments beginning in January 2013. The complaint requested foreclosure and sale of Ruiz's home.

66. Since Ocwen serviced Ruiz's account in January 2013, this false statement originated with Ocwen and was carried out by Wells Fargo, as trustee.

67. On December 6, 2014, Ruiz sent a fax to Mawani, who had been reassigned as her relationship manager, disputing the foreclosure filing. Ruiz sent the letter via facsimile and paid a fee to The UPS Store.

68. On January 28, 2015, Ocwen received a call from yet another Relationship Manager, Rafi (ID #10898). Rafi stated that the loan modification was denied, but that Ocwen made a mistake and the modification should have been approved. Rafi promised to fix the problem. Similar to Mawani's unfulfilled promises, Rafi never fulfilled his promise from January 28, 2015.

### D. Damages

69. As a result of Ocwen's conduct covering at least two years, Ruiz experienced severe stress, depression, and anxiety. Ruiz began to experience serious health issues that were brought on or exacerbated by the never-ending stress.

70. Ruiz's health and well-being drastically deteriorated. Ruiz's systemic sclerosis progressed, and her anxiety and depression contributed to the progression. Ruiz's disease began to impact multiple organs in her body.

71. By the end of 2014, Ruiz's physician diagnosed her with (a) depressive disorder; (b) anxiety disorder; and (c) systematic sclerosis that had worsened dramatically from the stress.

72. Ruiz saw a psychologist and pychiatrist to address her depression, daily feelings of hopelessness, feelings that she had let her family down, and concerns about the protection of her family home and her children. Ruiz is currently seeing mental health professionals to help manage the stress, anxiety, and depression.

73. Ruiz has suffered substantial damage from Ocwen's conduct, including:

   i.   Physical illness, injury, and medical bills;

   ii.  Emotional distress, stress, anxiety, and pain and suffering;

   iii. Public humiliation and embarrassment. The wrongful foreclosure filing is public record which can be obtained by anybody who searches the court records, further harming Ruiz's reputation;

   iv.  Expenditure of money and time to defend the foreclosure and rectify Ocwen's conduct;

   v.   Western Union fees and UPS fees and charges for shipping and facsimiles; and

   vi.  Additional interest, default charges, force placed insurance, and attorney's fees that have been wrongfully added to Ruiz's loan balance.

74. Ocwen's actions were the proximate cause of damages to Ruiz that include those set forth above, illegal costs and fees, loss of opportunities to save her home, never receiving the Operative Loan Modification or principal reduction, living in a perpetual state of "default," loss of equity in her home, emotional distress, physical illness and injury, medical bills, pain and suffering, and the loss of funds that Ocwen misapplied. By the time Ruiz realized she would not receive the Operative Loan Modification and the foreclosure had been filed against her, she had fewer options than when she began the process.

## COUNT I – BREACH OF CONTRACT

75. Ruiz restates and realleges paragraphs 1 through 74 above as if stated herein.

76. Ruiz has a valid and enforceable contract with Ocwen in the form of the Operative Loan Modfication.

77. Ruiz fully performed her duties under the Operative Loan Modification by submitting all paperwork and her trial down payment as directed. Ocwen accepted the signed agreement and $1,754.37 payment prior to the July 1, 2014 due date.

78. On July 2, 2014, Ocwen confirmed receipt of Ruiz's documents and payment and confirmed that the loan modification was finalized.

79. Ocwen was required to honor and implement the Operative Loan Modification. Ocwen failed to properly credit Ruiz's account or update her account to reflect the Operative Loan Modification.

80. Additionally, Ocwen's correspondence dated August 18 and 19, 2014 set forth the modified terms – "2.0%" interest rate and a monthly modification payment of "$1,754.37" – and also stated "Modification Approved."

81. The Operative Loan Modification stated, "If ALL of the items above are not completed by the Due Date [7/1/14], the Agreement shall have no force or effect and any down payment received will be returned to you." *See* Exhibit A attached hereto. Ocwen never returned Ruiz's down payment.

82. Even though the Operative Loan Modification brought Ruiz's account current, Ocwen continued to charge late fees and other costs associated with a "default."

83. Ocwen's attempts to "get out" of the Operative Loan Modification did not invalidate the agreement.

12

84. Ocwen breached the contract and the duty of good faith and fair dealing further by:

    i.   Failing to honor the modification;

    ii.   Misapplying or failing to properly account for Ruiz's loan modification down payment;

    iii.   Treating Ruiz's loan as a loan in default when it was not in default;

    iv.   "Voiding" the Operative Loan Modification after it was finalized and based on Ocwen's own error regarding the maturity date on the Balloon Disclosure;

    v.   Adding wrongful fees and charges to Ruiz's loan account including late fees, fees for monthly property inspections, and force-placed insurance charges; and

    vi.   Wrongfully foreclosing on a mortgage that was not in default.

85. Ocwen knew that a breach of the Operative Loan Modification would cause more than pecuniary loss to Ruiz.

86. Ruiz submitted multiple hardship letters that documented her medical conditions and orally advised Ocwen of her medical conditions many times between August 2012 and June 2014. Ocwen was aware of the stress imposed on Ruiz and how it would exacerbate her serious health conditions.

87. Ruiz suffered damages as set forth in the previous section that were proximately caused by the conduct of Ocwen described herein.

      WHEREFORE, Plaintiffs RENEE C. ELVIRA and EDWIN RUIZ respectfully request that this Honorable Court:

    a.   find that Ocwen materially breached the Operative Loan Modification;

    b.   award Ruiz their actual damages to be proven at trial;

    c.   award Ruiz punitive damages to be determined at trial;

    d.   award Ruiz reasonable attorney's fees and costs; and

    e.   award Ruiz any other relief this Honorable Court deems equitable and just.

### COUNT II – VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT

88. Ruiz meets the ICFA definition of "consumer" and "person." *See* 810 ILCS 505/1.

89. Ocwen violated 815 ILCS 505/2 by employing unfair and deceptive acts and practices when dealing with Ruiz. The unfair and deceptive acts and practices complained of occurred in the course of conduct involving trade or commerce.

90. Aside from loan servicing errors, Ocwen made outright unfair and deceptive misrepresentations to Ruiz as to the status of her loan account, status of her loan modification, the amounts owed, the status of "foreclosure sale dates," how Ruiz *should* act, Ocwen being able to unilaterally "void" the Operative Loan Modification, and Ocwen's actual treatment of Ruiz's account internally compared to its representations to Ruiz.

91. It was unfair and deceptive for Ocwen to threaten Ruiz on July 25, 2014 that the Operative Loan Modification was "void" because of its own error regarding the maturity date on the Balloon Disclosure, which did not actually invalidate the contract.

92. It was unfair and deceptive for Ocwen to promise Ruiz that Ocwen would send a "new" loan modification that mirrored the Operative Loan Modification – with the maturity date included – and then never send the "new" agreement and instead file foreclosure.

93. It was unfair and deceptive for Ocwen to threaten Ruiz that the Operative Loan Modification was "void" and then direct and induce Ruiz to stop payments until the "new" agreement was provided, only to immediately claim a payment default and file foreclosure.

94. It was unfair and deceptive for Ocwen to inform Ruiz that her loan was modified and current, when Ocwen never truly updated its internal system of record to reflect the terms of the loan modification.

95. It was unfair and deceptive for Ocwen to reject the Operative Loan Modification for four

separate and false reasons: (a) the lack of a maturity date on the Balloon Disclosure (on July 25, 2014), (b) Ruiz's failure to submit a the required RMA document even though it had been submitted multiple times (on July 28, 2014), (c) that the Operative Loan Modification was not signed when it was signed (on September 29, 2014), and (d) that Ruiz did not complete her trial payments (on September 29, 2014).

96. It was unfair and deceptive for Ocwen to falsely inform Ruiz, in two letters dated October 30, 3014 and November 3, 2014, that a "Foreclosure Sale Date is scheduled for 7/20/15" on her home, when no foreclosure was actually filed or sale date actually set.

97. It was unfair and deceptive for Ocwen to inundate Ruiz – leading up to and immediately following the execution of the Operative Loan Modification – with conflicting and false information about the validity of the Operative Loan Modification, conflicting and false correspondence with respect to the loan account, and through contradictory communications in response to (or ignoring) Ruiz's written and oral disputes and requests for information.

98. For example, Ocwen confirmed the validity of the loan modification (a) on July 2, 2014, (b) sent a correspondence dated August 22, 2014 setting forth the modified interest rate of "2.0%" and monthly modification payment of "$1,754.37," and (c) sent a correspondence dated August 19, 2014 that stated, "Our records indicate that you have agreed to participate in the Modification Approved."

99. In the same breath, Ocwen sent Ruiz (a) delinquency notices on August 23, 2014 and October 20, 2014 stating that she was approximately 600 days delinquent and owed approximately $40,000.00, (b) a statement dated September 17, 2014 claiming that Ruiz had an "amount due" of "$395,725.88" and included a payment coupon in the amount of "$395,725.88," (c) letters threatening foreclosure, and (d) a foreclosure dated December 3, 2014.

100. It was unfair and deceptive for Ocwen to induce Ruiz – both orally and in writing – to make a payment on the Operative Loan Modification when Ocwen never intended to implement nor actually implemented the Operative Loan Modification. Ocwen then took Ruiz's Operative Loan Modification payment and applied it internally to a superseded account and associated fees.

101. It was unfair for Ocwen to misrepresent attorney's fees, late fees, escrow charges, force-placed insurance charges, and other charges on a loan that was not in default, and refuse to provide any explanation or basis for the fees over a period of years.

102. It was unfair and deceptive for Ocwen to disregard Fannie Mae, HAMP, and the Ocwen National Servicing Settlement[3] guidelines and directives for the evaluation, formation, and servicing of Ruiz's loan modification, and then deny Ruiz the benefit of her loan modification.

103. It was unfair and deceptive to attempt to induce Ruiz to collude with Ocwen to modify and "back date" the Operative Loan Modification, in clear violation of Fannie Mae, HAMP, the Ocwen National Servicing Settlement, and lending laws.

104. It was unfair and deceptive for Ocwen to ignore Fannie Mae, HAMP, and the Ocwen National Servicing Settlement guidelines and directives for the evaluation, formation, and servicing of Ruiz's loan modification.

### A. Public Policy, Immoral Actions, and Substantial Injury to Consumers

105. Ocwen's conduct offends public policy as it demonstrates an industry-wide practice of charging unearned fees and costs to a borrower in order to make a profit, forcing borrowers to make loan modification payments without properly crediting the payments, misrepresenting material facts during the loan modification process, sending conflicting correspondences, falsely

---

[3] The Consumer Protection Bureau (CFPB) and the states attorneys general obtained a consent judgment with Ocwen to provide loan modifications to borrowers, including principal reductions on first lien mortgages. The Ocwen National Servicing Settlement standards are modeled after those in the National Mortgage Settlement and were to be in place by 2012. Ocwen National Servicing Settlement, *available at* https://nationalocwensettlement.com/ (last visited Aug. 19, 2015).

threatening foreclosure sales, and profiting off the borrower's payments and assessment of fees

and costs, with the sole intention of ultimately filing foreclosure and selling the real estate.

106.  Ocwen's actions cause substantial injury to consumers generally because:

     i.    consumers reasonably expect their contracts to be honored and accounts to be properly managed in a constant fashion without false or conflicting representations;

     ii.    consumers reasonably expect that, if there is a dispute, the servicer will take honest efforts to resolve the dispute instead of misrepresenting facts;

     iii.    consumers reasonably expect a dispute to be resolved expeditiously and not linger for several years;

     iv.    consumers reasonably expect that creditors and loan servicers will communicate with them truthfully and accurately regarding their loan accounts;

     v.    consumers reasonably expect that loan servicers will not make false representations or induce payments on false pretenses; and

     vi.    consumers reasonably expect servicers to comply with HAMP, Fannie Mae, and National Mortgage Settlement directives and guidelines.

107.  Additionally, consumers do not expect to be blindsided by threats of a foreclosure sale

after being induced to make payments on false pretenses, and after relying upon the servicer's

false representations regarding the status of their loan account.

108.  Ruiz's inquiries and disputes regarding the servicing of her loan were never

investigated nor adequately answered; the lack of clarity from Ocwen resulted in an

unsophisticated consumer entering into a perpetual state of confusion regarding the true status of

the mortgage loan. This never-ending battle lasted several years.

109.  Ruiz could not avoid these immoral undertakings because Ocwen would not accurately

communicate with her.

110. When taken as a whole over several years, Ocwen's conduct was so unethical and

unending that Ruiz had no choice but to submit. Ruiz had no actual control over (a) whether or

not Ocwen would implement the loan modification as promised, (b) how her account, payments,

and fees were handled or applied, (c) the foreclosure filing and the threat of the sale of her home, (d) how Ocwen truly treated the loan internally, and (e) whether what Ocwen represented was truthful.

111.  This conduct is part of a pattern and practice of behavior in which Ocwen routinely engages as part of its business model. It is Ocwen's normal business practice to disregard agreements and state and federal laws and regulations, and then misstate the nature of outstanding "debts" and amounts "owed" to consumers for its own pecuniary gain.

## B.  Intent, Reliance, and Punitive Damages

112.  Ocwen's conduct in relation to Ruiz was willful, malicious, and arbitrary. It was designed to place Ruiz's account in a perpetual state of "default" while taking advantage of a physically and emotionally vulnerable borrower and a financially vulnerable family.

113.  Ocwen's overall scheme was designed and intended to (a) thwart Ruiz's attempts to enforce the Operative Loan Modification, (b) discourage Ruiz from continuing to fight for her home and eventually "give up," (c) trick Ruiz into making a down payment, (d) trick Ruiz into sending and resending the same documents at least fifteen times over two years, and (e) trick Ruiz into reapplying for a loan modification after the Operative Loan Modification was finalized. Ultimately, Ocwen intended to keep Ruiz in a state of confusion while profiting from illegal fees, maximizing profits, and proceeding with a foreclose sale of Ruiz's home.

114.  Ocwen's actions were intentionally confusing and specifically designed to deceive Ruiz.

115.  Ocwen's communications and conduct were purposely confusing, false, misleading, and designed to trick Ruiz into believing that she had a loan modification and to require her to continue to send and resend the same documents. Ruiz could not decipher the true statements

18

from the false statements.

116. Ruiz was deceived and did in fact rely upon Ocwen's deceptive and unfair conduct to her detriment by doing exactly what Ocwen directed Ruiz to do – with the belief that Ocwen would honor its previous representations, promises, and lending guidelines. Ruiz relied upon the representations that the Operative Loan Modification was finalized, continued to send in the same paperwork upwards of fifteen times, incurred UPS shipping fees and UPS Store facsimile fees, abandoned other loss mitigation alternatives, lost time and money, and became physically and mentally harmed by years of stress.

117. Ruiz suffered damages proximately caused by the ICFA violations as described as above.

118. An award of punitive damages is appropriate because Ocwen's conduct was outrageous, willful, and wanton, and it showed a reckless disregard for the rights of Ruiz over several years. Additionally, when Ruiz objected, Ocwen attempted to silence Ruiz by filing a foreclosure lawsuit.

WHEREFORE, Plaintiffs RENEE C. ELVIRA and EDWIN RUIZ request that this Honorable Court:

a. enter judgment in Ruiz's favor and against Ocwen;

b. award Ruiz actual and punitive damages in an amount to be determined at trial for the underlying ICFA violations;

c. award Ruiz costs and reasonable attorney's fees as provided under 815 ILCS 505/10a(c); and

d. award any other relief as this Honorable Court deems just and appropriate.

### COUNT III – VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT

119.   Ruiz restates and realleges paragraphs 1 through 74 herein.

120.   Ruiz is a "consumer" as defined by FDCPA § 1692a(3).

121.   The subject debt and the unauthorized fees and costs qualify as a "debts" as defined by FDCPA § 1692a(5) as they arise out of a transaction for personal, family, or household purposes.

122.   Ocwen qualifies as a "debt collector" as defined by § 1692a(6) because it regularly collects debts and uses the mail and/or the telephones to collect delinquent consumer accounts.

123.   Ocwen qualifies as a "debt collector" because Ocwen treated the subject loan as it were in default when it acquired rights to the subject loan on April 1, 2012.

124.   All of the communications described herein were in furtherance of Ocwen's attempts to collect a debt from Ruiz.

### a.   Violation of §§ 1692e(5) and f(6)

125.   On both October 30, 2014 and November 3, 2014, Ocwen sent letters to Ruiz that stated, "your current Foreclosure Sale Date is scheduled for 7/20/15."

126.   At the time the letters were sent, no foreclosure lawsuit had been filed and no sale date had been scheduled. As provided in the Illinois Mortgage Foreclosure Law, a sale date cannot be set until a judgment of foreclosure is entered and the 90 day redemption period expires.

127.   As such, these letters threatened to take action that cannot legally be taken or intended to be taken, represented a false means to collect a debt, and threatened to unlawfully dispossess Ruiz of her home through a foreclosure sale in violation of §§ 1692e(5) and f(6).

### b. Violation of § 1692e(11)

128.  In many of Ocwen's communication to Ruiz, Ocwen failed to state that the communication was from a debt collector.

129.  Including but not limited to the statements dated August 18, 2014 and August 19, 2014, and received by Ruiz on August 22, 2014 and August 23, 2014, respectively, Ocwen failed to state that the communication was from a debt collector in violation of § 1692e(11).

### c. Violation of  § 1692d

130.  Ocwen engaged in abusive and oppressive conduct in violation of FDCPA § 1692d through (i) improper mismanagement of Ruiz's loan account; (ii) refusal to correct its accounting errors or adequately respond to Ruiz's repeated disputes; (iii) conflicting and false correspondences and communications, (iv) falsely claiming (under four separate and distinct grounds) the Operative Loan Modification was invalid or "void," (v) the assessment of illegal fees and charges and attempts to collect substantially more than the amount owed; (vi) forcing Ruiz to a perpetual state of "default," (vii) falsely threatening foreclosure sales of Ruiz's home, and (viii) ultimately filing foreclosure.

### d. Violation of §§ 1692e(2), e(10), and f(1)

131.  Ocwen's actions were unfair, unconscionable, false, and deceptive as a result of its (i) misrepresentations of the character, legal status, and amount of the debt; (ii) attempts to collect illegal fees and costs not authorized by law or contract; (iii) misrepresentation of the amounts owed to cure the "default;" (iv) declaring the loan in delinquent or default status; (v) assessment of illegal fees and corporate advances against Ruiz; (vi) using false and deceptive means to collect the debt, and (vi) attempting to collect the debt in a fashion not authorized by the

underlying contract or law by falsely threatening a foreclosure sale when no foreclosure had been filed and later initiating a wrongful foreclosure action.

132.  It was unfair and unconscionable for Ocwen to misrepresent the debt by lumping its fees, unauthorized corporate advances, and costs in with the principal debt obligation, and seeking payment of amounts that were not authorized by the contract or permitted by law in violation of FDCPA §§ 1692e(2), e(10), and f(1).

133. Ruiz suffered damages proximately caused by the FDCPA violations as described as above.

WHEREFORE, Plaintiffs RENEE ELVIRA and EDWIN RUIZ request that this Honorable Court:

    a.   enter judgment in favor of Ruiz and against Ocwen;

    b.   declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

    c.   award Ruiz statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

    d.   award Ruiz costs and reasonable attorney's fees as provided under 15 U.S.C. §1692k; and

    e.   award any other relief as this Honorable Court deems just and appropriate

**Plaintiff demands trial by jury.**

Respectfully Submitted,

By: \_\_\_/s/Mara A. Baltabols\_\_\_\_
**Mara A. Baltabols**
Attorney for Plaintiffs

Sulaiman Law Group, Ltd.
Mara A. Baltabols
ARDC # 6299033
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523