**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RENEE C. ELVIRA and EDWIN RUIZ; | ) | CIVIL ACTION |
| Plaintiffs; | ) | |
| | ) | Case No. 15-cv-7291 |
| OCWEN LOAN SERVICING, LLC; v. | ) | Honorable Matthey F. Kennelly |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Renee C. Elvira and Edwin Ruiz, by the undersigned attorneys, file this first amended complaint against Defendant Ocwen Loan Servicing, LLC as follows:

### NATURE OF THE ACTION

1. Plaintiffs Renee C. Elvira and Edwin Ruiz bring this action for damages for breach of contract, and for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") and the Fair Debt Collection Practices Act ("FDCPA").

2. All of the claims stated herein stem from the wrongful servicing and debt collection activities related to Plaintiffs' home mortgage loan.

### JURISDICTION AND VENUE

3. Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 1692k (FDCPA), as the action arises under the laws of the United States. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391, as the events complained of occurred in this District.

4. Diversity jurisdiction is conferred upon this Court by 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000.00 and is between citizens of different states.

**PARTIES**

5.   Plaintiffs RENEE C. ELVIRA and EDWIN RUIZ (collectively "Ruiz") are natural persons that own and occupy the property located at 10853 Ursula Drive, Willow Springs, Illinois 60480 ("subject property") as their residence.

6.   Defendant OCWEN LOAN SERVICING, LLC ("Ocwen") is a Florida corporation with its principal place of business in Florida. Ocwen is a foreign company that acts as a debt collector and servicer of mortgage loans across the country, including in the state of Illinois.

**FACTUAL BACKGROUND**

**A.  Original Mortgage Loan and Dealings With JPMorgan Chase Bank, N.A.**

7.   On November 24, 2004, Ruiz obtained a home mortgage loan in the amount $329,600.00 from Argent Mortgage Company, LLC for the purchase of the subject property. Ruiz lived in and raised her three children at the subject property over the last 11 years.

8.   The mortgage loan required a monthly payment for principal and interest in the amount of $2,220.58. The loan also required monthly escrow payments for real estate taxes and insurance in the approximate amount of $600.00.[1]

9.   In 2007, servicing rights to the loan were sold to JPMorgan Chase Bank, N.A. ("Chase").

10. In 2011, Ruiz experienced financial difficulties and defaulted on her payment obligations to Chase. Upon information and belief, Ruiz was in default for the monthly payment due October 1, 2011. Shortly thereafter, Ruiz submitted a HAMP loan modification application to Chase.

11. On January 10, 2012, Chase approved Ruiz for a trial loan modification that required three trial payments in the amount of $1,906.05 due February 1, 2012, March 1, 2012, and April 1, 2012. After successful completion of the trial payments, Ruiz's loan was to be permanently

---

[1] These amounts did change over the life of the loan as the interest rate was adjustable and the amount due for taxes and insurance varied from year to year.

2

modified and brought current. *See* Exhibit A attached hereto is the Chase trial modification.

12. Ruiz made all three trial payments of $1,906.05 on time and fully complied with all other terms and obligations in the agreement; Ruiz was entitled to a permanent loan modification that brought her account current.

13. After Ruiz made her third trial payment on March 21, 2012 (due April 1, 2012), Ruiz's loan was transferred from Chase to Defendant Ocwen with an effective date of April 1, 2012.

### B. Ocwen's Conduct After the Transfer

14. On April 10, 2012, Ocwen sent Ruiz a letter stating that Ruiz's loan account was delinquent and describing "Alternatives to Foreclosure."

15. On April 11, 2012, however, Ocwen sent Ruiz its first mortgage statement setting forth a principal balance of $343,478.53 and "Current Forbearance Payment Due by 05/01/12: $1,906.05." This acknowledged Ruiz's loan modification with Chase, the modified $1,906.05 monthly payment, and that Ruiz was current through April 2012. *See* Exhibit B attached hereto is the April 11, 2012 statement.

16. On April 23, 2012, Ocwen sent Ruiz a letter with "Alternatives to Foreclosure," setting forth deadlines to submit a loan modification application, as if there was no loan modification in place. However, the letter also stated:

> **I am currently on a trial modification plan. What do I do?**
>
> *You should continue making your monthly payments as required in the modification plan, even if you have completed your making your trial payments. Your prior servicer will be providing Ocwen the status of your modification. Our goal is to review your loan as soon as possible and provide your final modification agreement to you once we have completed processing. Please follow[sic] up to 30 days from the date of the transfer for Ocwen to obtain and process your application documentation.*

17. Notwithstanding the conflicting communications, Ruiz made and Ocwen accepted Ruiz's payment in the amount of $1,906.05 for May 2012. This was the fourth consecutive monthly payment under the loan modification, and first since completion of the three month trial period.

18. On May 16, 2012, Ocwen sent its second mortgage statement to Ruiz. The statement acknowledged receipt of Ruiz's $1,906.05 payment for May 2012. However, the statement stated that Ruiz owed a monthly payment of $2,502.88 for June 1, 2012 ($600 more than the loan modification amount) and that Ruiz was in substantial default with "Past Due Amounts DUE IMMEDIATELY: $17,850.94." The statement also claimed that Ruiz owed $3,200 in default-related fees and charges. *See* Exhibit C attached hereto is the May 16, 2012 statement.

19. From the servicing transfer in April 2012 through August 2012, Ocwen continued to make default collection calls to Ruiz and send letters claiming that Ruiz was in substantial default. Ocwen's monthly statements dated June 18, 2012 and July 17, 2012 asserted that Ruiz owed between $23,000 and $26,500 and did not recognize the loan modification.

20. During this same time period, Ruiz informed Ocwen numerous times that she had completed a trial loan modification with Chase and made all of her payments. Ocwen continued to claim that it had no knowledge of the Chase loan modification.

21. Ocwen's own servicing records demonstrate that the Chase loan modification was available in Ocwen's own image inventory called "CIS."

22. However, Ocwen did not communicate this to Ruiz or correct the account. By August 17, 2012, Owen was still sending statements asserting that Ruiz was $29,000 in default and did not have a loan modification. Ruiz's disputes continued.

23. Also during this time period, and with notice of the Chase loan modification, Ocwen had its vendor (Altisource) perform "Pre-Foreclosure Property Inspections" – on June 21, 2012, July 18, 2012, and August 22, 2012 – whereby individuals were sent to Ruiz's home, without warning or notice, to take pictures or gather other information about the property.

### C. **Ocwen's August 2012 Loan Modification**

24. On August 27, 2012, Ocwen mailed Ruiz a new loan modification. The modification required a $1,910.08 down payment by October 1, 2012 and monthly payments of $1,910.08 thereafter. *See* Exhibit D attached hereto is the Ocwen Loan Modification.[2]

25. The monthly payments under the Ocwen Loan Modification were $4 more than the Chase Loan Modification for the first five years. However, the interest rate increased in 2017. At that time, the monthly payments would become approximately $200 higher each month. *Id.*

26. More importantly, Ocwen increased the principal balance to $368,358.36. This was $24,879.83 more than the actual principal balance on the loan at the time of the April 1, 2012 transfer from Chase ($343,478.53) four months prior. *See* Exhibits B and D.

27. On top of that, the Ocwen Loan Modification included a balloon payment that was due on December 1, 2034. A balloon disclosure was provided, but it did not provide any information as to the amount of the balloon payment. *See* Exhibit D.

28. On about September 10, 2012, Ruiz received the Ocwen Loan Modification in the mail; it included a "time is of the essence" clause. Ruiz had fewer than three weeks to execute, return, and make the down payment.

29. The terms of the Ocwen Loan Modification – the increased monthly payments, increased principal balance, and substantial balloon payment – were entirely arbitrary, not even reasonably related to Ruiz's actual account status, harmful to Ruiz, and advantageous to Ocwen.

30. Notably, the actual balloon payment due on December 1, 2034 under the Ocwen Loan Modification was substantial; approximately $120,000.00. The modification was silent as to the amount; no disclosure of the balloon payment amount was provided. *See* Exhibit D.

---

[2] Hereinafter, the January 10, 2012 trial loan modification attached as Exhibit A will be referred to as the "Chase Loan Modification," and the August 27, 2012 loan modification attached as Exhibit D will be referred to as the "Ocwen Loan Modification."

31. On September 12, 2012, Ocwen sent Ruiz another letter with "Alternatives to Foreclosure."

32. Ruiz felt as if she had two options. She could accept the Ocwen Loan Modification under Ocwen's terms, or she could reject the modification and be faced with additional collection letters, property inspections, and ultimately foreclosure.

33. On September 21, 2012, Ruiz, fearful of losing her family home, executed the Ocwen Loan Modification and sent Ocwen her down payment that was due October 1, 2012. Ocwen implemented the terms of the modification into its system of record.

34. Ruiz proceeded to make the required $1,910.08 monthly payments for November and December 2012 as well. However, Ruiz began to second guess the legitimacy of the Ocwen Loan Modification, based on regular, but inconsistent, collection calls, and Ocwen's negative credit reporting on Ruiz's credit files.

35. During this time, some of the calls would be requesting payment from Ruiz, even though Ruiz was current. Some calls offered "reinstatement" figures on a loan that was not in default.

36. On December 4, 2012, in response to one of Ruiz's disputes, Ocwen sent Ruiz a letter outlining its own reporting to the credit bureaus. Ocwen reported Ruiz as "6+ payments delinquent" every month from April 2012 through September 2012. In other words, even though Ocwen failed to implement the Chase Loan Modification upon the April 2012 transfer, Ocwen continued to hold Ruiz responsible and substantially delinquent during the next six months.

37. On December 17, 2012, Ruiz spoke with Ocwen (Rizwan) over the phone. At the time, Ruiz was current on the Ocwen Loan Modification, and Ocwen had accepted her three required payments for October, November, and December 2012.

38. Rizwan stated that Ruiz was behind on payments and offered to send Ruiz reinstatement figures. This made no sense. Reinstatement by definition is a one-time payment to cover any past due amounts. Ruiz was not past due.

39. Around this time, Ruiz realized that she was never provided with the complete Ocwen Loan Modification countersigned by Ocwen; she also began to question the increased principal balance and the unknown amount of the balloon payment.

40. In several phone calls in December 2012 and January 2013, Ruiz requested the complete loan modification from Ocwen and clarification on the balloon payment.

41. Nothing was resolved or clarified for Ruiz.

42. On January 22, 2013, Ocwen sent Ruiz a letter stating that, "our records indicate that your mortgage loan payment due on December 10, 2012 has not yet been received." This was entirely false, as Ruiz made and Ocwen accepted Ruiz's December 2012 payment.

43. At this point, Ruiz effectively gave up on the Ocwen Loan Modification and her home, realizing that she was treated unfairly and in a worse position than when she started the process. She was physically and financially vulnerable and felt defeated.

44. Ruiz did not make any more payments on the Ocwen Loan Modification in 2013.

45. For the remainder of 2013, Ocwen sent Ruiz regular monthly statements, pre-foreclosure letters, and acceleration notices.

46. On November 18, 2013 and December 17, 2013, Ocwen sent Ruiz monthly statements stating that Ruiz was in foreclosure. This was false.

### D. **Ocwen's June 2014 Loan Modification Offer**

47. From January 2014 to November 2014, Ocwen continued to send Ruiz regular correspondence falsely informing Ruiz that she was in foreclosure.[3]

48. On March 4, 2014, Ocwen (Wasim) explained to Ruiz over the phone that Ocwen had a loan modification program for Ruiz whereby Ruiz could qualify for a modification that would include a principal reduction for distressed loans.

49. On March 5, 2014, Ocwen sent Ruiz the loan modification application, requiring financial documents to be submitted by June 2, 2014. On May 17, 2014, Ruiz completed, signed, and sent a full loan modification package to Ocwen.

50. On June 13, 2014, Ocwen sent Ruiz a cover letter and proposed loan modification. The cover letter stated that the owner of Ruiz's loan did not allow principal reductions and expressed how time is of the essence. *See* Exhibit E attached hereto is the June 13, 2014 cover letter.

51. The proposed modification required Ruiz to sign and return the agreement and make a $1,754.37 down payment by July 1, 2014. *See* Exhibit F attached hereto is the June 13, 2014 proposed loan modification.

52. Thereafter, the agreement included a one month trial period, requiring one trial payment in the amount of $1,754.37 on or before August 1, 2014. *Id.*

53. Notwithstanding the cover letter, the agreement did include a reduced principal balance of $298,454.32, a monthly payment of $1,754.37, and a balloon payment of $149,221.20. *Id.*

54. The balloon disclosure stated, "Your estimated balloon payment amount is $149,221.20 and will be due in a single payment on __**[blank space]**__..." *Id.* at p. 5 (emphasis added).

---

[3] Specific correspondence from 2014 are dated January 17, February 17, March 17, March 21, April 17, April 26, May 19, May 20, August 18, September 17, and November 17.

55. The proposed modification also included a "time is of the essence" clause that required Ruiz to sign and return the agreement by June 30, 2014, and make her July 1, 2014 and August 1, 2014 payments timely. If the agreement was timely executed and both payments were timely made, the loan would be contractually current and permanently modified. However, if the signed agreement or either payment was untimely, the modification would be null and void, and Ocwen was required to return to Ruiz any down payment received. *Id.* at p. 1.

56. On June 30, 2014, believing the new loan modification was the best option for her family, Ruiz signed and returned the agreement to Ocwen. *Id*. Also on June 30, 2014, Ruiz made her July 1, 2014 down payment in the amount of $1,754.37 via Western Union.

57. On or around July 2, 2014, Ruiz contacted Ocwen to confirm receipt of the signed agreement and payment. Ocwen confirmed receipt of both. This finally provided Ruiz with some relief. However, the relief was short-lived.

58. On July 7, 2014, Ocwen (Bhooshan) called Ruiz and claimed that she was due for her July 2014 modification payment. This was false as the payment was already made and accepted.

59. On or around July 7, 2014, Bhooshan told Ruiz that she was 552 days delinquent. Over the next several weeks, Ocwen made additional phone calls (sometimes twice per day) to Ruiz; each call had conflicting information.

60. On July 25, 2014, Ruiz received a call from her relationship manager at that time, Mawani. Mawani stated that the new loan modification was not accepted because *Ocwen* did not include a maturity date on the balloon disclosure. *Id*. at p. 5. Mawani stated that a corrected agreement was mailed to Ruiz on July 18, 2014 and requested that Ruiz sign and return it.

61. Ruiz stated that she had not received a corrected agreement, and pointed out that she was harassed by Ocwen twice per day – while she was current – throughout the entire month of July; there was no mention of any problem with the balloon disclosure.

62. Ruiz explained that she was being told two different things and was confused. Rightfully or wrongfully, Ruiz understood from Mawani that the new loan modification was void.

63. Notably, Ocwen had identified the problem with the balloon disclosure internally on July 2, 2014. Ocwen did not mention the problem in any of the many prior phone calls.

64. Later on July 25, 2014, Ruiz spoke with Ocwen (Pretti). Ruiz requested that Ocwen return her $1,754.37 down payment. Pretti refused and stated that Ruiz was months delinquent.

65. On July 28, 2014, Ocwen sent a letter stating that Ruiz's loss mitigation application was incomplete; and Ocwen (Shovani) called Ruiz claiming she was 19 payments delinquent.

66. In light of the previous experience with the Ocwen Loan Modification in 2012, Ruiz began to give up on the new loan modification. In either event, she did not receive the corrected agreement and could not sign it.

67. Between July 29, 2014 and August 18, 2014, Ruiz had many conversations with Ocwen regarding Ruiz never receiving the corrected agreement and the status of her account.

68. On August 14, 2014, Ocwen ordered another property inspection.

69. On August 18, 2014, Ocwen sent Ruiz a statement claiming that Ruiz's loan was accelerated and in foreclosure. The letter also stated that Ruiz's monthly payment was increasing to $2,143.34 in October 2014.

70. Ruiz was not in foreclosure. Additionally, increasing the monthly payment from $1,754.37 to $2,143.34, almost immediately after the loan modification, was entirely arbitrary and designed to induce a default by Ruiz.

### E. Ocwen's "Corrected" Modification

71. On August 18, 2014, Ruiz finally received a cover letter dated July 18, 2014 with the corrected modification agreement attached. The "corrected" agreement was identical to the June 13, 2014 cover letter and modification (Exhibits E & F); the only difference being the inclusion of the due date in the balloon disclosure. None of the deadlines or other terms were changed. *See* Exhibit G attached hereto is the July 18, 2014 cover letter and its enclosures.

72. Even though Ocwen caused the problem that required correction to the balloon disclosure, Ocwen claimed that it could unilaterally cancel the modification. The cover letter stated, "[U]ntil we receive a properly executed modification agreement, we reserve the right to cancel or reverse those improved terms at any time without notice." *Id*.

73. Based on the dates set forth in the cover letter (dated July 18, 2014) and the "corrected" agreement (still dated June 13, 2014), Ruiz could not satisfy the "time is of the essence" clause even if she immediately executed and returned the agreement.[4] *See* Exhibit G.

74. The following day, on August 19, 2014, Ocwen sent Ruiz a "Delinquency Notice" stating that Ruiz was 595 days delinquent, and that a failure to pay $39,000 may result in fees and foreclosure

75. At this point, Ruiz abandoned the new loan modification altogether. Even if Ruiz tried to comply with the terms of the corrected agreement, she felt that Ocwen would simply take her money, still hold her in default, and proceed with foreclosure.

---

[4] Based on the express language in the cover letter and loan modification, it was factually impossible for Ruiz to satisfy the "time is of the essence" clause on August 18, 2014. However, Ruiz does not necessarily believe that the "time is of the essence" clause would have *legally* prevented a contract from being formed, simply because the strict deadlines were not met. That is Ocwen's contention.

On one hand, Ocwen advised Ruiz that she should hold off making the August 1, 2014 installment (strict deadline) until her previously scheduled appointment with her relationship manager occurred later in August 2014 – especially in light of the fact the Ruiz had not yet received the corrected agreement. During this time period, Ocwen's communications were conflicting. Sometimes time was of the essence and other times it was not. Ruiz simply did not trust anything Ocwen stated at this point.

76. On September 18, 2014, Ruiz sent Ocwen a letter disputing the handling of her account.

77. On September 29, 2014, Ocwen sent Ruiz a letter stating that the new modification was denied because Ruiz did not timely sign the agreement.

78. Also on September 29, 2014, Ocwen sent Ruiz a different letter stating that the new modification was denied because Ruiz "did not make all of the required Trial Period Plan payments by the end of the trial period."

79. On October 30, 2014, Ocwen sent Ruiz a letter that stated, "According to our Records, your current Foreclosure Sale Date is scheduled for 7/20/15." This was false. No foreclosure case was filed at that time, let alone a foreclosure sale scheduled.

80. On November 3, 2014, Ocwen again sent Ruiz a letter that stated, "According to our Records, your current Foreclosure Sale Date is scheduled for 7/20/15." This was false.

81. On November 18, 2014, Ocwen again sent Ruiz a letter that stated, "According to our Records, your current Foreclosure Sale Date is scheduled for 8/19/15." This was false.

82. Ruiz continued to make efforts to reach a resolution with Ocwen. Throughout this time period, Ruiz was assigned countless different "Relationship Managers," most of which were entirely unfamiliar with her account.

83. On December 3, 2014, Ocwen, through Wells Fargo Bank, N.A., filed a mortgage foreclosure lawsuit against Ruiz in state court. The foreclosure case is captioned: *Wells Fargo Bank, N.A. as Trustee for Park Place Securities, Inc. Asset-Backed Pass-Through Certificates Series 2005-WCH1 v. Ruiz, et al.*, Case No. 14 CH 19316 (Cook County).

84. On December 6, 2014, Ruiz sent a fax to Mawani disputing the foreclosure filing.

85. On December 9, 2014, Ocwen again sent Ruiz a letter that stated, "According to our Records, your current Foreclosure Sale Date is scheduled for 8/19/15." This was false.

86. Even after the foreclosure filing, Ruiz continued to try to reach a resolution with Ocwen.

87. On December 18, 2014, Ocwen sent Ruiz a letter denying Ruiz for all loan modification options. Subsequent discussions occurred between Ruiz and Ocwen into 2015, but it was clear to Ruiz at this point that Ocwen was committed to taking Ruiz's home in foreclosure.

**F. Damages**

88. As a result of Ocwen's conduct over at least two years, Ruiz experienced severe stress and anxiety. Ruiz began to experience serious health issues that were brought on or exacerbated by the never-ending stress – impacting multiple organs in the body.

89. By the end of 2014, Ruiz's physician diagnosed her with (a) depressive disorder; (b) anxiety disorder; and (c) systematic sclerosis that had worsened from the stress. Ruiz is currently seeing mental health professionals to help manage her stress, anxiety, depression.

90. Ruiz has suffered damage from Ocwen's conduct, including:

     i.    Physical illness, injury, and medical bills (including prescription medications);

    ii.    Emotional distress and pain and suffering;

   iii.    Expenditure of money and time to defend against Ocwen's conduct and foreclosure;

   iv.    Western Union fees and UPS fees for shipping and facsimiles;

    v.    An inflated principal balance and balloon payment on her loan account; and

   vi.    Additional interest, charges, and fees added to Ruiz's loan balance.

91. Ocwen's actions were the proximate cause of damages to Ruiz that include those set forth above, loss of opportunities to save her home, living in a perpetual state of "default," and the loss of funds that Ocwen misapplied. By the time Ruiz realized that she would not obtain a resolution, she had fewer options than when she began the process.

13

## COUNT I – BREACH OF CONTRACT

92. Ruiz restates and realleges paragraphs 1 through 91 above as if stated herein.

93. Ruiz has a valid and enforceable contract with Ocwen in the form of the Chase Loan Modification. Ocwen, as the assignee of the contract, steps into the shoes of the assignor. Additionally, as the assignee, Ocwen must honor the commitments and obligations of the assignor. *See* Exhibit A.

94. Ruiz fully performed her duties and obligations under the Chase Loan Modification and made all payments timely.

95. Ocwen's own correspondence dated April 11, 2012 acknowledged the Chase Loan Modification and Ocwen accepted the May 2012 monthly payment from Ruiz under the terms of the Chase Loan Modification. *See* Exhibits B & C.

96. Thereafter, beginning on May 16, 2012, Ocwen claimed that Ruiz was in substantial default and charged late fees and other "default" related charges, even though the Chase Loan Modification brought Ruiz's account current. *See* Exhibits A, B, & C.

97. Ocwen was required to honor and implement the Chase Loan Modification. Ocwen failed to honor and never implemented the Chase Loan Modification.

98. Instead, Ocwen gave Ruiz two options. Either face foreclosure, or enter into a new agreement with Ocwen that included a higher monthly payment, higher principal balance, and a substantial balloon payment. *See* Exhibits A, B, & D. This was entirely arbitrary and capricious.

99. Ocwen's attempts to "get out" of the Chase Loan Modification did not invalidate the agreement.

14

100. Ocwen further breached the contract and the duty of good faith and fair dealing by:

    i. Failing to honor the modification;

    ii. Misapplying Ruiz's loan modification payments;

    iii. Treating Ruiz's loan as in "default" when it was not in default;

    iv. Arbitrarily requiring a subsequent loan modification that was advantageous to Ocwen and harmful to Ruiz;

    v. Adding wrongful fees and charges to Ruiz's loan account, including late fees, property inspections fees, and legal fees; and

    vi. Inducing a "default" to force Ruiz into a new agreement under Ocwen's terms.

101. Additionally, Ocwen knew that a breach of the Chase Loan Modification would cause more than pecuniary loss to Ruiz. Ocwen had in its own records at the time of the servicing transfer Ruiz's hardship letters that documented her medical conditions. Ocwen knew or should have known that a breach of the Chase Loan Modification could cause physical harm to Ruiz.

102. Ruiz suffered damages as set forth in the previous section that were proximately caused by the conduct of Ocwen described herein.

WHEREFORE, Plaintiffs RENEE C. ELVIRA and EDWIN RUIZ respectfully request that this Honorable Court:

    a. find that Ocwen materially breached the Chase Loan Modification;

    b. award Ruiz actual damages to be proven at trial;

    c. award Ruiz punitive damages to be determined at trial;

    d. award Ruiz reasonable attorney's fees and costs; and

    e. award Ruiz any other relief this Honorable Court deems equitable and just.

<u>**C**OUNT **II** – **V**IOLATIONS OF THE **I**LLINOIS **C**ONSUMER **F**RAUD **A**CT</u>

103.  Ruiz restates and realleges paragraphs 1 through 91 above as if stated herein.

104.  Ruiz meets the ICFA definition of "consumer" and "person." *See* 810 ILCS 505/1.

105.  Ocwen violated 815 ILCS 505/2 by employing unfair and deceptive acts and practices when dealing with Ruiz. The unfair and deceptive acts and practices complained of occurred in the course of conduct involving trade or commerce.

106.  Ocwen made outright unfair and deceptive representations to Ruiz as to the status of her loan account, status of her loan modifications, the amounts owed, the status of "foreclosure sale dates," how Ruiz *should* act, and Ocwen's actual treatment of Ruiz's account internally compared to its representations to Ruiz.

107.  With respect to the Chase Loan Modification, it was unfair and deceptive for Ocwen to:

      i.    Ignore the modification and Ruiz's actual account history and trial payments;

     ii.    Falsely claim that it did not have any record of the modification upon the April 2012 transfer, when its own records demonstrate otherwise. *See* Exhibit B;

    iii.    Send Ruiz notices with false and misleading information, including on August 17, 2012, claiming a substantial default and demanding nearly $29,000.00;

    iv.    Send individuals (from its vendor Altisource) to Ruiz's home to perform "pre-foreclosure" property inspections, including the inspection on August 22, 2012;

     v.    Falsely claim that Ruiz was "6+ payments delinquent" for every month from April 2012 through September 2012 and continue to hold Ruiz responsible for its own errors and omissions; and

    vi.    Continue to assess default related fees and charges in the face of its own errors and repeated notice.

108. With respect to the Ocwen Loan Modification in 2012, it was unfair and deceptive for Ocwen to:

     i.   Arbitrarily offer Ruiz a loan modification with higher monthly payments, an inflated principal balance, and a $120,000.00 balloon payment. The terms were entirely arbitrary, harmful to Ruiz, and advantageous to Ocwen;

     ii.   Include a balloon disclosure but fail provide any information as to the amount or significance of the balloon payment;

     iii.   Provide Ruiz fewer than three weeks to either accept the Ocwen Loan Modfication under Ocwen's terms, or effectively be faced with additional collection letters, property inspections, and ultimately foreclosure;

     iv.   Falsely claim on December 17, 2012 over the phone (Rizwan) and in a letter dated January 22, 2012 that Ruiz failed to make her December 2012 payment, even though her account was current; and

     v.   Refuse to provide Ruiz with a countersigned copy of the Ocwen Loan Modification.

109. With respect to Ocwen's proposed loan modification in 2014, it was unfair and deceptive for Ocwen to:

     i.   Inform Ruiz that the modification was not accepted because of Ocwen's own error regarding the balloon disclosure;

     ii.   Fail to inform Ruiz of the "problem" regarding the balloon disclosure until July 25, 2014; Ocwen had documented the problem with the balloon disclosure in its own records on July 2, 2014;

     iii.   Place Ruiz in a position where she could not timely comply with the terms of the "corrected" modification when she received it on August 18, 2014;

     iv.   Arbitrarily increase Ruiz's monthly payments from $1,754.37 to $2,143.34 within 60 days of the down payment; and

     v.   Refuse to return the $1,754.37 down payment to Ruiz.

110. With respect to all of the loan modifications, it was unfair and deceptive for Ocwen to inundate Ruiz with conflicting and false information in telephone calls and correspondence regarding the status of Ruiz's account and claims of default.

111. It was unfair for Ocwen to misrepresent attorney's fees, late fees, escrow charges, force-placed insurance charges, and other charges on a loan that was not in default.

112.  It was unfair for Ocwen to refuse to provide any explanation or basis for its conduct over the course of several years in response to Ruiz's disputes.

113.  It was unfair and deceptive for Ocwen to send at least 12 correspondences over the course of a year – between November 18, 2013 and November 17, 2014 – falsely informing Ruiz that she was in foreclosure when no foreclosure was filed.

114.  It was unfair and deceptive for Ocwen to falsely inform Ruiz in four letters – dated October 30, 3014, November 3, 2014, November 18, 2014, and December 9, 2014 – that a "Foreclosure Sale Date is scheduled" on her home when no foreclosure was actually filed or sale date actually set.

115.  It was unfair and deceptive for Ocwen to ignore Fannie Mae, HAMP, and the Ocwen National Servicing Settlement guidelines and directives for the evaluation, formation, and servicing of Ruiz's account and various loan modifications.[5]

116.  With respect to the proposed loan modification in 2014, Ocwen did not adhere to the Ocwen National Servicing Settlement guidelines and directives by:

      i.     Failing to offer and facilitate a loan modification for Ruiz, and initiating foreclosure before determining that Ruiz was not eligible for a loan modification;

     ii.     Failing to establish an easily accessible and reliable single point of contact ("SPOC");

    iii.     Failing to coordinate, or assign an SPOC to coordinate, the receipt of all documents associated with the loan modification and clear any processing requirements for the loan modification;

    iv.     Failing to properly explain the requirements for the loan modification or disclose and provide accurate information to Ruiz relating to the qualification process and eligibility factors for Ocwen's loss mitigation programs; and

     v.     Failing to provide, or assign an SPOC to provide, all basic information about the status of Ruiz's account, loan modification applications, and foreclosure activity.

---

[5] The Consumer Protection Bureau (CFPB) and the states attorneys general obtained a consent judgment with Ocwen to provide loan modifications to borrowers, including principal reductions on first lien mortgages. The Ocwen National Servicing Settlement standards are modeled after those in the National Mortgage Settlement and became effective February 26, 2014. Ocwen National Servicing Settlement, *available at* https://nationalocwensettlement.com/ (last visited April 25, 2016).

### A. **Public Policy, Immoral Actions, and Substantial Injury to Consumers**

117.  Ocwen's conduct offends public policy as it demonstrates an industry-wide practice of charging unearned fees and costs to a borrower in order to make a profit, forcing borrowers to make loan modification payments without properly crediting the payments, misrepresenting material facts during the loan modification process, sending conflicting correspondences, falsely threatening foreclosure sales, and profiting from the borrower's payments, with the sole intention of ultimately filing foreclosure and selling the real estate.

118.  Ocwen's actions cause substantial injury to consumers generally because:

     i.    consumers reasonably expect that loan servicers will communicate with them truthfully and accurately regarding their account and payments;

     ii.    consumers reasonably expect that loan servicers will not make false representations or induce payments on false pretenses;

     iii.    consumers reasonably expect that, if there is a dispute, the servicer will make honest efforts to resolve the dispute expeditiously, instead of misrepresenting facts or not responding altogether;

     iv.    consumers reasonably expect that a successor loan servicer will make efforts to contact the previous servicer to obtain all information regarding the account; and

     v.    consumers reasonably expect servicers to comply with HAMP, Fannie Mae, and/or National Mortgage Settlement guidelines and directives.

119.  Additionally, consumers do not expect to be blindsided by a foreclosure.

120.  Ruiz could not avoid these immoral undertakings because Ocwen would not accurately communicate with her. Ruiz's inquiries and disputes regarding the servicing of her loan were never investigated nor adequately answered; the lack of clarity resulted in an unsophisticated consumer entering into a perpetual state of confusion regarding the true status of her account.

121. When taken as a whole over several years, Ocwen's conduct was so unethical and unending that Ruiz had no choice but to submit. Ruiz had no actual control over (a) the transfer of the loan account to Ocwen; (b) whether Ocwen made any efforts to contact Chase regarding the Chase Loan Modification; (c) the arbitrary terms in the Ocwen Loan Modification; (d) how

her account, payments, and fees were assessed or applied; (e) the threats of foreclosure; (f) how Ocwen truly treated the loan internally; and (g) whether what Ocwen represented was truthful.

122. This conduct is part of a pattern and practice of behavior in which Ocwen routinely engages as part of its business model. It is Ocwen's normal business practice to disregard agreements and state and federal laws and regulations, and then misstate the nature of outstanding "debts" and amounts "owed" to consumers for its own pecuniary gain.

### B. Intent, Reliance, and Punitive Damages

123. Ocwen's conduct in relation to Ruiz was willful, malicious, and arbitrary. It was designed to place Ruiz's account in a perpetual state of "default" while taking advantage of a physically and emotionally vulnerable borrower and a financially vulnerable family.

124. Ocwen's overall scheme was designed and intended to (a) trick Ruiz into making timely payments on the 2012 Ocwen Loan Modification while continuing to hold Ruiz in "default;" (b) trick Ruiz into making a down payment on the proposed modification in 2014; and (c) discourage Ruiz from continuing to fight for her home and eventually "give up." Ultimately, Ocwen intended to keep Ruiz in a perpetual state of confusion while profiting from illegal fees, maximizing profits, and proceeding with a foreclose sale of Ruiz's home.

125. Ocwen's communications were intentionally confusing, misleading, and designed to deceive Ruiz into making payments, while gearing up for foreclosure, and force Ruiz into a position where she could not decipher the true statements from the false statements.

126. Ruiz was deceived and did rely on Ocwen's deceptive and unfair conduct by making payments with the belief that Ocwen would treat Ruiz honestly and follow servicing guidelines, and fearing the (false) threats of a foreclosure lawsuit and foreclosure sale. Ruiz abandoned other loss mitigation alternatives, lost time and money, and was harmed by years of stress.

127. Ruiz suffered damages as described above that were proximately caused by Ocwen's ICFA violations.

128. An award of punitive damages is appropriate because Ocwen's conduct was outrageous, willful, and wanton, and showed a reckless disregard for the rights of Ruiz over several years. Additionally, when Ruiz objected, Ocwen attempted to silence Ruiz by claiming that Ruiz was in foreclosure when she was not, and ultimately filing a foreclosure lawsuit.

WHEREFORE, Plaintiffs RENEE C. ELVIRA and EDWIN RUIZ request that this Honorable Court:

a. enter judgment in Ruiz's favor and against Ocwen;

b. award Ruiz actual and punitive damages in an amount to be determined at trial for the underlying ICFA violations;

c. award Ruiz costs and reasonable attorney's fees as provided under 815 ILCS 505/10a(c); and

d. award any other relief as this Honorable Court deems just and appropriate.

### COUNT III – VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT

129. Ruiz restates and realleges paragraphs 1 through 91 herein.

130. Ruiz is a "consumer" as defined by FDCPA § 1692a(3).

131. Ocwen qualifies as a "debt collector" as defined by § 1692a(6) because it regularly collects debts and uses the mails and/or the telephones to collect delinquent consumer accounts.

132. Ocwen qualifies as a "debt collector" because the principal purpose of its business is to collect debts, and because it regularly collects or attempts to collect debts owed to another party.

133. Ocwen qualifies as a "debt collector" because it treated the subject loan as in default when it acquired rights to the subject loan on April 1, 2012.

134. All of the actions and communications described herein were in furtherance of Ocwen's attempts to collect a debt from Ruiz.

### A. Violation of §§ 1692e(5) and f(6)

135.  On at least October 30, 2014, November 3, 2014, November 18, 2014, and December 9, 2014, Ocwen sent letters to Ruiz falsely stating that Ruiz was in foreclosure and that a foreclosure sale date was set.

136.  At the time the letters were sent, no foreclosure lawsuit had been filed and no sale date had been scheduled.[6] As provided in the Illinois Mortgage Foreclosure Law, a sale date cannot be set until a judgment of foreclosure is entered and the 90 day redemption period expires.

137.  These letters threatened to take action that cannot legally be taken, represented a false means to collect a debt, and threatened to unlawfully dispossess Ruiz of her home through a foreclosure sale.

### B. Violation of § 1692e(11)

138.  In many of Ocwen's communications to Ruiz, Ocwen failed to state that the communication was from a "debt collector," including but not limited to the statements dated August 18, 2014 (two), October 17, 2014, and November 17, 2014. The August 18, 2014 statements were received by Ruiz on or about August 22, 2014.

### C. Violation of § 1692d

139.  Ocwen engaged in abusive and oppressive conduct through its (a) improper management of Ruiz's loan account; (b) refusal to correct its errors or adequately respond to Ruiz's repeated disputes; (c) conflicting and false communications; (d) assessment of illegal fees and attempts to collect substantially more than the amount owed; (e) forcing Ruiz into a perpetual state of "default;" (f) false threats of foreclosure sales of Ruiz's home; and (g) ultimately filing foreclosure.

---

[6] The December 9, 2014 letter was sent after the foreclosure suit was filed, but no sale date was scheduled.

### D. Violation of §§ 1692e(2), e(10), and f(1)

140. Ocwen's actions were unfair, unconscionable, false, and deceptive as a result of its (a) misrepresentations of the character, legal status, and amount of the debt; (b) assessment of illegal fees and corporate advances against Ruiz; (c) false threats of a foreclosure sale when no foreclosure was actually filed; (d) initiating a wrongful foreclosure action; and (e) lumping its fees, unauthorized corporate advances, and costs in with the principal debt obligation.

141. Ruiz suffered damages as described above proximately caused by Ocwen's FDCPA violations.

WHEREFORE, Plaintiffs RENEE ELVIRA and EDWIN RUIZ request that this Honorable Court:

a. enter judgment in favor of Ruiz and against Ocwen;

b. declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

c. award Ruiz statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

d. award Ruiz costs and reasonable attorney's fees as provided under 15 U.S.C. §1692k; and

e. award any other relief as this Honorable Court deems just and appropriate

**PLAINTIFFS DEMAND TRIAL BY JURY**

Respectfully Submitted,

By: ___/s/ Ross M. Zambon____
    **Ross M. Zambon**
    Attorney for Plaintiffs

Ross M. Zambon, # 6294149
Zambon Law, Ltd.
Sulaiman Law Group, Ltd. (*of counsel*)
Mara A. Baltabols, # 6299033
Sulaiman Law Group, Ltd.
Attorney for Plaintiffs
900 Jorie Boulevard, Suite 150
Oak Brook, Illinois 60523